

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF TEXAS

3       WACO DIVISION

4

5
THE UNITED STATES OF AMERICA,* Criminal No. W07-20M
6                              *
     Plaintiff,           *
7                              *
        v.                     *
8                              *
PATRICK ESTELL JONES,       *
9                              *
     Defendant.       * February 6, 2007
10 * * * * * * * * * * * * * *

11 --------------------------------------------------

12      PRELIMINARY EXAMINATION

13   BEFORE THE HONORABLE JEFFREY MANSKE

14      UNITED STATES MAGISTRATE JUDGE

15 --------------------------------------------------

16
APPEARANCES:
17

18 For the Plaintiff:  UNITED STATES ATTORNEY'S OFFICE
                   By: Ms. Stephanie Smith-Burris
19                     800 Franklin, Suite 280
                   Waco, Texas  76701
20
   For the Defendant:  MOODY & CROW
21                     By: Mr. Ronald H. Moody
                   204 N. 6th
22                     Waco, Texas  76701

23

24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.

1                    INDEX

2

3  WITNESSES FOR          Direct  Cross  Redirect  Recross
   THE PLAINTIFF
4
   JAMES RANKIN           3     13
5

6
   WITNESSES FOR
7  THE DEFENDANT

8       --

9

10  EXHIBITS:                   Offered   Received

11
   (No exhibits offered.)
12

13
   ARGUMENT:  Ms. Smith-Burris          24, 28
14  RESPONSE:  Mr. Moody                 25
   THE COURT:  Takes Case Under Advisement    29
15

16            ************

17

18

19

20

21

22

23

24

25

1     COURTROOM DEPUTY: Case Number W07-20M,

2 Defendant Number 2, The United States of America

3 versus Patrick Jones, for preliminary examination.

4     MS. SMITH-BURRIS: Stephanie Smith-Burris,

5 for the Government.

6     THE COURT: Thank you.

7     MR. MOODY: Ron Moody, for the Defendant.

8     THE COURT: Hello again, Mr. Moody.

9     MR. MOODY: Good afternoon, your Honor.

10     THE COURT: All right. Is the Government

11 ready to proceed?

12     MS. SMITH-BURRIS: The Government's ready,

13 your Honor. We'd call Jim Rankin to the stand.

14     THE COURT: All right. My understanding,

15 this is a preliminary examination only.

16     MS. SMITH-BURRIS: That's correct,

17 your Honor.

18     (Witness sworn by the Courtroom Deputy.)

19     THE COURT: Good afternoon.

20     You may proceed.

21     MS. SMITH-BURRIS: Thank you.

22     DIRECT EXAMINATION

23 BY MS. SMITH-BURRIS:

24 Q.  Would you state your name, please?

25 A.  James Rankin.

1 Q. How are you employed?

2 A. I am a narcotics officer for Temple Police

3 Department.

4 Q. And are you the case agent on the case of United

5 States versus Patrick Estell Jones and Sharon Latrice

6 Jones?

7 A. I am.

8 Q. Do you see Patrick Jones in the courtroom?

9 A. I do.

10 Q. Could you point him out and describe an article

11 of clothing that he's wearing, please?

12 A. He's wearing orange, sitting at the table right

13 there, next to you.

14    MS. SMITH-BURRIS: Your Honor, would the

15 record reflect the Witness has identified Defendant

16 Patrick Jones sitting at the table?

17    THE COURT: The record will so reflect.

18    MS. SMITH-BURRIS: Thank you.

19 Q. (By Ms. Smith-Burris) Could you give the details

20 of this arrest, please?

21 A. I can. I was looking for a suspect that I had a

22 warrant for. I had information that that subject was

23 at 2114 South 5th Street, in an apartment, Number 33.

24 I went to that apartment, knocked on the door. A

25 black female answered the door; she was later

1 identified as Sharon Jones. I had a picture of the

2 suspect I was looking for with me. I showed her the

3 picture and asked her if that subject was in her

4 residence. She said she was not in there. I could

5 see through the door that another black female was --

6 was sitting inside the residence; the one I was

7 looking for was a white female.

8    I asked her if I could come in and check for that

9 subject. She said I could. She opened the door, and,

10 as I walked in, she reached down and threw something

11 up underneath an end table. I couldn't tell what it

12 was initially. I asked her what she had thrown under

13 there, and she said, initially, nothing, she was

14 moving a purse. I asked her again if anyone else was

15 in the residence, and then she told me that, yes, her

16 sister and husband were in the back bedroom area.

17    At that time, I looked down at the coffee table,

18 and I could see a push rod on the table, a rod used

19 for pushing the Brillo out of crack pipes. I asked

20 her to ask Mr. Jones and her sister if they could come

21 into the living room area; they did. They all sat

22 down. I asked her again what it was that was up

23 underneath the table. She said something that -- that

24 she had moved her purse. I asked her if I could

25 check. She reached down, pulled out a can that had

1 been turned into a pipe. What it was, was a -- they

2 had punched holes in the top of it and had been

3 smoking, she later told me, cocaine in there. I

4 initially thought it was marijuana. I've normally

5 seen those cans used for smoking marijuana.

6 I got consent from her -- Initially, I got

7 consent to search. There was a purse -- The purse

8 actually on the floor belonged to her sister, who was

9 sitting on the couch. I asked whose purse it was; her

10 sister told me it was hers. I asked if I could look

11 in there, and she said yes. While I was looking in

12 that purse, Sharon Jones asked her sister to hand her

13 her purse, which was on the end table on the other

14 side of the couch. And she made some statement as to

15 needing to get medication out of there. She handed

16 her the purse.

17 Q. "She," the sister?

18 A. The sister handed Sharon Jones the purse. She

19 reached inside, and, when she did that, I told her to

20 stop. One, I didn't know what she was going for in

21 her purse, a weapon or dope. I kind of thought maybe

22 that there were some drugs in the purse she was trying

23 to get out. But -- So, she handed me the purse.

24 Prior to that, though, she zipped a side pocket in the

25 purse, handed me the purse. Without even reaching in

1 the purse, I looked inside there and there was a

2 baggie with one rock inside it that I could see

3 without even -- by just looking down inside.

4 Q. And when you're referring to "rock," what are you

5 referring to?

6 A. It was a yellowish-white rock that appeared to me

7 to be crack cocaine.

8 Q. Go ahead.

9 A. I unzipped the pocket that she had zipped, and

10 looked in there. And inside that pocket was a clear

11 baggie containing 11 or 12 pretty large crack rocks.

12 All these later tested positive for crack cocaine.

13    At that point, I -- Prior to that, I had called

14 for another unit, so I had a backup officer there with

15 me. But, at that point, I contacted my supervisor,

16 Sergeant Clark, of the narcotics unit. He and several

17 other officers that work in narcotics came to the

18 residence. When he got there -- I had already had

19 consent to search, but I wanted to get them there

20 because I thought that there might be more drugs in

21 the apartment.

22 Q. Who did you get the consent to search from?

23 A. Initially, Sharon Jones; I was dealing with

24 purses. And then at one point -- The sister kept

25 talking, and at one point Mr. Jones told her to shut

1 up and let him go on with his search.

2     But, like I say, I contacted the narcotics office

3 and got the agents over there. Once they got there,

4 Sharon Jones, before we went ahead with the rest of

5 the apartment, we got an actual consent to search form

6 signed. And then there were numerous places in the

7 residence, mainly in the closet in the bedroom, we

8 found a pretty large quantity of cocaine, off of

9 cookies. When the cocaine's cooked initially, they

10 come out in kind of a cookie form. Well, there were

11 quarters, I believe three or four quarters, separated.

12     We found pills, some in baggies, some in a pill

13 bottle, three or four different types of pills. We

14 found what we believe is codeine in a bottle that the

15 prescription was off of. All these things have been

16 sent to the lab for further checking out. We're not

17 sure about the codeine, but we believe that's what it

18 is.

19 Q. Would you put on the record where you found the

20 different locations of crack cocaine in the residence,

21 besides Sharon Jones's purse, please?

22 A. In the -- In the kitchen on a table was a

23 matchbox. Inside that matchbox was a quarter cookie

24 of crack cocaine.

25 Q. Now, you're saying "a matchbox." A small

1 matchbox?

2 A.  No.  It's a large -- Probably four or five inches

3 by three inch, one of the larger kitchen matchboxes.

4 And the only thing in it was a -- about a quarter

5 cookie of crack cocaine.

6 Q.  And was that matchbox laying on the plain -- on

7 plain -- in plain view on the kitchen table?

8 A.  Yes.  It was just laying right on the table.

9 Q.  Okay.

10 A.  And, initially, she said that it had something to

11 do with, I guess, Mr. Jones does tattooing, or

12 something like that.  But it tested positive.

13     In the bedroom closet, in different places in the

14 closet, were found numerous rocks, quarter-cookie

15 sizes.  Total, I believe, 44.5 grams is what we

16 recovered out of the residence, to include the purse,

17 what we found in the closet, and what was in there on

18 the kitchen table.

19 Q.  And that's a combination of crack cocaine and

20 powder cocaine; is that correct?

21 A.  That's correct.  There was also two baggies of

22 powder cocaine found in the bedroom closet.

23 Q.  This bedroom closet that you're talking about,

24 how many bedrooms are in the apartment?

25 A.  Just one.

1 Q.  Okay.  How many closets are in the bedroom?

2 A.  I believe there was just one.

3 Q.  Was the -- The different locations of crack

4 cocaine that was found in the closet, were they

5 scattered throughout the closet or was it all in one

6 location?

7 A.  They were in different places.  I believe the

8 powder -- And I would have to go back.  I believe the

9 powder was -- There was a record player, an old style

10 record player; I believe some portion of the dope that

11 was found in the closet was under the lid of that.

12 And then, you know, a couple of other places it was

13 found.  I don't recall exactly.  I would have to refer

14 back to the report.

15 Q.  Does Patrick Jones live in that apartment?

16 A.  Yes.

17 Q.  How do you know that?

18 A.  He told me he lived there.  Sharon Jones told me

19 they both lived there.  And I also talked to the

20 manager and received a copy of the lease.  And they

21 were both on the lease, and both signed the lease.

22 Q.  And at the time that you -- that you all executed

23 the search, did Patrick Jones give you verbal consent

24 to search, along with Sharon Jones?

25 A.  Yes.  Initially, I asked -- And I don't recall

1 exactly, but I asked if we could search the residence.

2 And, like I said, at one -- one point, he even told

3 everybody to shut up and let us go ahead with the

4 search. The sister was more boisterous in there, I

5 believe, than anyone else that was in the apartment.

6 Q. Than either Sharon Jones or Patrick Jones?

7 A. Right.

8 Q. Okay. And the copy of the lease that you took a

9 look at, it indicates that they moved in there on

10 10-27 of '06; is that correct?

11 A. That sounds right.

12 Q. And did you have any information at all that

13 Patrick Jones was not living in that residence?

14 A. No.

15 Q. In fact, he specifically told you that he lived

16 there; is that correct?

17 A. Right. I asked both of them if they both resided

18 there. And I believe Sharon Jones told me that they

19 had -- they had just gotten married, I believe, like a

20 month prior to that, to the date that we were there.

21 Q. Okay. And, at some point, have you been able to

22 review a videotape that was found during the execution

23 of your search warrant?

24 A. I have.

25 Q. Okay. And, on that videotape, do you hear a

1 phone -- or can you see Patrick Jones on the

2 telephone, or can you hear Patrick Jones on the phone?

3 A.  You can hear him on the telephone.

4 Q.  Can you describe basically for the Court what

5 you're hearing?

6 A.  What it sounds like is someone, and they identify

7 him as "G."  The phone rings.  Sharon Jones answers

8 the phone, asks who it is, then she says "G."  And it

9 sounds like she says, "James" after that, trying to

10 figure out who "G" is, and then she says "G" again.

11 Then she comes back into the room where Patrick is,

12 and says something like, he wants a 50, or something

13 like that.

14     Patrick Jones goes and gets on the phone, and

15 something to the effect, I got 25, come on over, I'm

16 not -- I don't want to leave right now.  I don't

17 remember exactly, but to that effect.  Sounded like

18 someone calling for drugs, to me.

19 Q.  All right.  At the time of the execution of the

20 search warrant, do you know how many grams of crack

21 cocaine you found?  Was it more than five?

22 A.  Yes.

23     MS. SMITH-BURRIS:  Pass the Witness, your

24 Honor.

25     THE COURT:  All right.  Mr. Moody?

1        CROSS-EXAMINATION

2 BY MR. MOODY:

3 Q. Officer Rankin?

4 A. Yes, sir.

5 Q. My name is Ron Moody. I think we've met before.

6 A. I believe so, sir. Yes, sir.

7 Q. I just have a few questions to ask you. I've got

8 a copy of your affidavit, so, basically, I'm familiar

9 with your statement.

10 A. Okay.

11 Q. On this particular evening, or this afternoon, I

12 guess it was January the 31st, at about 2:18 p.m.,

13 that was in the afternoon. What day of the week was

14 that on, by the way; do you recall?

15 A. No.

16 Q. It's not important; I just wondered. I think it

17 was on a weekend or --

18 A. I can figure it out here, if you need me to,

19 but...

20 Q. Okay. But you were there, at that location, to

21 execute an arrest warrant; is that correct?

22 A. Correct. I'm looking for a suspect that I had

23 information was there.

24 Q. Okay. And, so, you had an arrest warrant for

25 that suspect?

1  A.  I did.

2  Q.  Okay.  And this -- You had information that this

3  suspect was at this apartment complex, in Unit Number

4  33?

5  A.  Well, what I had was, I had talked to a female

6  the day prior to me going over there, who was actually

7  at our police department, wanting to become an

8  informant.  She had -- I had brought up this person

9  that I was looking for, and she told me that, one, she

10  had seen her in this apartment; and, two, that the day

11  prior to me talking to her, that her and another

12  gentleman had actually went over there and picked her

13  up.

14      She gave me the first name of Sharon, as a female

15  in the apartment, and she actually had a nickname for

16  a male in the apartment.  I don't recall what it was

17  now, but I knew a different subject that went by that

18  name; didn't believe it was the same person there,

19  because I know where he stays.

20      I went to the apartment complex there, and the

21  first thing I did was went and talked to the manager,

22  and I asked her was she renting an apartment to a

23  black female with the first name of Sharon.  And she

24  told me, yes, in 33.  I said, is that the only one?

25  And she said yes.

1 Q. Okay. So, prior --

2 A. So, --

3 Q. I'm sorry.

4 A. Go ahead.

5 Q. I don't mean to interrupt.

6 A. No, that's fine.

7 Q. But prior to that conversation with the manager,

8 you did not have any reason to believe that that

9 suspect might be in Apartment 33?

10 A. The actual Number 33?

11 Q. Yes.

12 A. No.

13 Q. Okay. And just so that I'm clear, you didn't

14 have a search warrant --

15 A. I did not.

16 Q. -- for Apartment 33?

17 A. No, sir.

18 Q. You didn't have an arrest warrant for Sharon

19 Jones?

20 A. No, sir.

21 Q. You didn't have an arrest warrant for Patrick

22 Jones?

23 A. I did not have an arrest warrant for Patrick

24 Jones.

25 Q. Okay. So, when you -- when you knocked on the

1 door, a female, who later was identified as Sharon

2 Jones, answered the door; is that correct?

3 A. Correct.

4 Q. And you showed her a copy of this picture that

5 you had, and asked her if that individual was in the

6 apartment; is that right?.

7 A. Yes, sir.

8 Q. And she told you no?

9 A. Yes, sir.

10 Q. Now, at that point in time, did you have any

11 reason to believe that Ms. Jones was lying to you?

12 A. I didn't know. Like I said, I had information

13 that she was staying there, and she knew that I was

14 looking for her.

15 Q. Who was "she" you're talking about?

16 A. The suspect that I -- I had -- Frances Whitlock

17 is her name.

18 Q. The suspect knew that you were looking for her?

19 A. Yes, sir.

20 Q. Mrs. Jones didn't know that you were looking for

21 her?

22 A. Oh, I don't know if she knew or not.

23 Q. Okay.

24 A. But, like I said, I had reason to believe she was

25 there; that's why I asked her if I could look.

1 Q.  Well, at that point in time, before you asked for

2 permission to enter that apartment, did you see any

3 kind of illegal activity going on?

4 A.  No.

5 Q.  Did you see any illegal contraband, or drugs, or

6 anything that would give rise to a suspicion that

7 there might be some illegal activity going on?

8 A.  No, sir.  Not -- Not before she allowed me inside

9 the residence, no, sir.

10 Q.  So, at that point in time, no articulable facts

11 that you were relying on to -- for any reasonable

12 suspicion or probable cause that there might be any

13 illegal activity going on in that apartment?

14 A.  The only -- The only thing that I can tell you in

15 regards to that is that I did not, at that time, have

16 any information believing anything was going on.  I'll

17 let it go at that, sir.  No, sir.

18 Q.  All right.  But, yet, you asked for permission to

19 come in and look around the apartment?

20 A.  To see if the suspect was there.  Yes, sir.

21 Q.  And your testimony is that Mrs. Jones voluntarily

22 allowed you to enter the apartment?

23 A.  She did.

24 Q.  All right.  Where was Mr. Jones when you entered

25 the apartment?

1 A.  He was in the bathroom, I believe.

2 Q.  He was not in the main room when you entered?

3 A.  No.

4 Q.  There was two -- two individuals in that room,

5 Ms. Jones and Ms. Johnson?

6 A.  There were --

7 Q.  Tiffany -- I mean, Amanda Nicole Johnson, was she

8 the one sitting in the chair?

9 A.  That's not the sister; right?

10 Q.  I think the sister is Tiffany Ellison.  No, I'm

11 sorry.

12 A.  It's the other way around.

13 Q.  No.  Okay.  Tiffany Ellison was the one --

14 A.  Right.  That was the other female in the

15 living room.  Yes, sir.

16 Q.  All right.  Now, after you entered and you looked

17 around, you didn't see the suspect that you were

18 looking for; is that correct?

19 A.  Not in that area.  Like I say, when I -- when I

20 walked in the door, Sharon Jones reached down and

21 threw something up under the end table.

22 Q.  You testified you didn't know what that was?

23 A.  Right.  Initially, I did not know what that what

24 was.  But then I did see what appeared to be a push

25 rod, to me, on the table.  But, no, she was not in

1 that area when I walked in. I did not see her.

2 Q. Okay.

3 A. I asked Ms. Jones, again, is there anyone else in

4 the apartment? And she said, well, yeah, my husband

5 and my sister. Initially she told me there was no one

6 else in the apartment. Why, I don't know. Probably,

7 if I can venture a guess here, is that Mr. Jones had a

8 parole violation warrant, and that's probably why he

9 was back there, would be my guess, --

10 Q. Okay.

11 A. -- is why she told me that there was no one else

12 in the apartment. That would be a guess.

13 Q. But you weren't there looking for Mr. Jones?

14 A. No.

15 Q. Okay. Other than this push rod that you say you

16 saw on the coffee table, --

17 A. Right.

18 Q. -- did you see any drugs?

19 A. No, sir.

20 Q. Any other evidence of any kind of illegal

21 activity in that apartment, other than you just saw

22 what you're describing as a push rod?

23 A. Correct. And whatever I believe she threw up

24 underneath the table at the time, I thought was

25 probably drugs. I didn't know.

1 Q. Right.

2 A. But I wanted to see.

3 Q. Okay. Will you describe the push rod to me?

4 A. It was a silver rod, probably about this long,

5 appeared to be kind of discolored on one end. And

6 normally those rods, you know, they use them over and

7 over to push out the Brillo in a pipe. And --

8 Q. Is that the specific purpose that this rod is

9 manufactured, or is there a --

10 A. Oh, no. There --

11 Q. -- is there a legitimate use for it?

12 A. They'll make them out of anything, coat hangers

13 or -- I mean, it could have been made out of anything.

14 I don't know what it initially was. That's what it

15 appeared to be.

16 Q. The rod, itself, is not illegal? Am I

17 understanding that this rod can have some legitimate

18 purpose?

19 A. Possibly. I mean, I don't know what it was

20 before it was cut into what looked, to me, to be a

21 push rod. I don't know.

22 Q. Is the rod, in and of itself, illegal?

23 A. I -- No, sir.

24 Q. Okay. At that point in time, you asked for

25 consent to search the residence; is that correct?

1  Or, at some point in time, --

2  A.  Yes, sir.

3  Q.  -- you asked for consent to search the residence?

4  A.  Yes, sir.

5  Q.  And it's your testimony that Mrs. Jones gave you

6  verbal consent to search the premises?

7  A.  Correct.

8  Q.  And at some point in time subsequent to that she

9  actually gave you written consent to search the

10 premises?

11 A.  Correct.

12 Q.  Okay.  Now, did Mr. Jones ever verbally say, in

13 response to a question, you know, can I search this

14 apartment, did Mr. Jones ever say, yes, it's fine for

15 you to search?  Did he verbally consent?

16 A.  I don't recall exactly -- Mr. Jones didn't say

17 much while we were in there.  I don't recall exactly

18 what Mr. Jones said initially.  Initially, I was -- I

19 was looking at the purses.  I do recall distinctly

20 that Mr. Jones told the sister to be quiet and let him

21 go on with what he's doing, which was the search at

22 the time.

23 Q.  That you go on with what you were doing?

24 A.  Correct.  What I was doing.

25 Q.  Yes, sir.

1 A.   The sister, I don't recall exactly the words, but

2 she was talking the whole time.  And she said

3 something to the effect of, I don't know why you're

4 looking, or what gives you the right to look, or

5 something to that effect.

6       And I said something like, well, she gave me

7 consent.  That's what gives me the right.

8       And then Mr. Jones said something along the lines

9 of, shut up and let him do -- finish what he's doing,

10 or do what he's doing, or something like that.

11 Q.   But, in direct response to a -- to a direct

12 question, he never said, yeah, it's okay for you to

13 search?  It's just -- You just -- By -- By the

14 statement that he made, you assumed that that's what

15 he meant; is that fair?

16 A.   I don't recall exactly what he said.

17 Q.   He never gave you written consent to search, did

18 he?

19 A.   And -- No.

20 Q.   Okay.  The matchbox with the crack cocaine in

21 it, --

22 A.   Yes, sir.

23 Q.   -- was on the kitchen table?

24 A.   It was.

25 Q.   All right.  You said it was in plain view?

1 A. The box was, yes, sir.

2 Q. The box was in plain view?

3 A. Right.

4 Q. Was the box closed, --

5 A. Yes, sir.

6 Q. -- or was it open?

7 A. It was closed.

8 Q. Okay. So, you had to open the box to be able to

9 see the crack cocaine in it; correct?

10 A. Correct.

11 Q. All right. At some point in time after he was

12 arrested, did you all search Mr. Jones?

13 A. I'm sure we did.

14 Q. Did you find any crack cocaine, drugs, drug

15 paraphernalia, or anything like that on his person?

16 A. No, sir.

17 Q. All right. The dope that was in the closet,

18 where -- you said some of it was under a lid of an old

19 antique record player?

20 A. I, personally, was not the one that searched the

21 closet; it was one of the agents. And there were

22 several different places in the closet that -- that

23 the drugs were found. I just recall -- And I believe

24 it was the powder cocaine that was found up underneath

25 the record player. And there were other -- other

1 spots in the closet where other drugs were found.

2 Q. Was there clothing in the closet?

3 A. As I recall, there were. I didn't, personally,

4 search the closet. I would have to look.

5 Q. Okay. Do you know whether or not there were any

6 of these drugs that were found in the closet, were any

7 of those drugs found on or in articles of clothing in

8 the closet?

9 A. I don't believe so.

10 Q. Okay.

11         MR. MOODY: Pass the Witness, your Honor.

12         THE COURT: All right. Any redirect?

13         MS. SMITH-BURRIS: No, sir.

14         THE COURT: All right. You may step down,

15 sir.

16         THE WITNESS: Thank you, sir.

17         MS. SMITH-BURRIS: Government rests, your

18 Honor.

19         THE COURT: Any evidence?

20         MR. MOODY: No evidence, your Honor.

21         THE COURT: All right. Very well.

22 Would you like to make a brief argument?

23         MS. SMITH-BURRIS: Very briefly, your Honor.

24 We'd ask this Court to send this case to the

25 Grand Jury, your Honor, as to Patrick Jones. It's

1 clear, from the evidence, that he lived at the

2 household, that numerous stashes of crack cocaine and

3 powder cocaine were found in different locations in

4 the house. Apparently, according to the testimony of

5 Investigator Rankin, there was only one bedroom with a

6 closet in there. That's where quite a bit of the

7 crack cocaine was found. The other part of the crack

8 cocaine that was not found in the female's purse was

9 found on the kitchen table, which clearly is a common

10 area within the apartment. It was at least five

11 grams.

12     We'd ask the Court to send this case to the

13 Grand Jury. Thank you.

14     THE COURT: Mr. Moody?

15     MR. MOODY: Yes, your Honor. If it please

16 the Court.

17     Your Honor, I think there's two points here that

18 I'd like the Court to consider. First of all, I'm

19 very concerned about probable cause in this case. The

20 search, itself, the probable cause for the search, the

21 testimony is that there was no search warrant and no

22 arrest warrant for my client or Ms. Jones, no search

23 warrant for the apartment. The officer testified that

24 he didn't see any illegal activity going on, no

25 articulable facts that he relied upon, other than he

1 just wanted to go in and look inside. And he had no

2 reason to believe that Ms. Jones was lying to him

3 about this individual, this fugitive that he was

4 looking for, not being there.

5     I think he, you know, certainly has the right

6 to investigate to a -- to a certain point. But when

7 you -- when you reach the point to where you're going

8 to ask for permission to enter the premises, without

9 any articulable facts to rely on, that investigation

10 then becomes a -- in my opinion, under these facts, a

11 detention, an investigatory detention, which I don't

12 think there's any evidence that would support or give

13 the officer any right to ask to enter the premises.

14 So, I feel like there's a -- there's a significant

15 probable cause issue here on the -- on the validity of

16 the search, itself.

17     As far as my client, he hadn't -- didn't have any

18 drugs on him. He was not in the room where these

19 other two ladies were evidently -- I don't know if

20 they were smoking crack cocaine, or what, but he

21 wasn't in there when -- when the officer entered and

22 she threw this can under the end table. The drugs

23 were in her purse, and a matchbox on the kitchen table

24 that was closed, not in -- the drugs were not in plain

25 view.

1    I just don't think that there's any nexus that's

2  been testified to here in this court today to tie my

3  client to these drugs, other than the fact that he

4  lived there, if, in fact, he did.  The drugs in the

5  closet were not found in any articles of his clothing.

6  I think that the evidence is wholly insufficient to

7  bind him over for a -- for a Grand Jury, and we're

8  respectfully asking the Court to dismiss these

9  charges.

10    THE COURT:  Do you have any case law to

11  suggest that the Court should consider the validity of

12  the search, itself, or the right of the officer to be

13  present prior to making a probable cause determination

14  on the preliminary examination side of things?

15    MR. MOODY:  I don't have any cases with me

16  that I can cite to the Court right now.  I've -- I

17  have -- I have done some research in this area,

18  because I'm in the process of arguing a motion to

19  suppress in state court on an issue that's very close

20  to this, on a warrantless search and a warrantless

21  arrest.

22    THE COURT:  I don't think the validity of

23  the officer's presence at the apartment, and later

24  going into the apartment, is of -- should be

25  considered by this Court at this time, unless you have

1 some case law to the authority -- I mean, to the

2 contrary. I'm happy to give you, you know, a couple

3 of days to look to see if you can find some, prior to

4 the Court making a determination on the preliminary

5 examination.

6 MR. MOODY: I'd like that opportunity, your

7 Honor. I think I could provide you with some pretty

8 good case law.

9 THE COURT: All right. I want to find

10 something from the Fifth Circuit that indicates --

11 MR. MOODY: Okay.

12 THE COURT: -- that, and nothing on a

13 state --

14 MR. MOODY: Give me a day or two. And if I

15 can't find something, I'll advise the Court

16 immediately.

17 THE COURT: That's fine. I'll give you till

18 the close of business on Thursday, the 8th.

19 MR. MOODY: That's fine. Thank you.

20 THE COURT: All right?

21 MR. MOODY: Yes, sir.

22 THE COURT: Thank you.

23 Ms. Smith-Burris?

24 MS. SMITH-BURRIS: Yes, your Honor. Very

25 briefly, in rebuttal, your Honor.

1    We believe that that is certainly an issue that

2    can be taken up at a better time in a motion to

3    suppress. We believe, clearly, there's plenty of

4    probable cause to send this over to the Grand Jury.

5    The amounts of crack cocaine that were found were in

6    the only bedroom in that apartment. This Defendant

7    lived in that bedroom. The fact that no dope was

8    found on him means absolutely nothing. There was no

9    dope found on Sharon Jones's person either.

10    In addition, your Honor, just a reminder that the

11   large crack cocaine cookie was found in the middle of

12   the dining room table in this apartment. It's clearly

13   not a large apartment. This Defendant is a resident

14   there, your Honor. There's clearly enough to send

15   this to the Grand Jury. We would ask the Court to go

16   ahead and bind it over. That's it, your Honor.

17    THE COURT: All right. The only issue I

18   have is the first one that we discussed. I think,

19   once that is resolved, the Court's not going to have

20   any difficulty establishing probable cause for the

21   underlying offense.

22    MS. SMITH-BURRIS: Yes, your Honor.

23    THE COURT: All right? Just so you know

24   where I'm coming from. But the Court will reserve

25   making a ruling until Mr. Moody has a chance to submit